756 F.2d 230
 82 A.L.R.Fed. 531, Fed. Sec. L. Rep. P 91,952
 GARY PLASTIC PACKAGING CORPORATION, a New York corporation,
for itself and all others similarly situated,
Plaintiff-Appellant,
v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., a Delaware
Corporation and Merrill Lynch Money Markets, Inc.,
a Delaware Corporation, Defendants-Appellees.
 Nos. 252, 365, Dockets 84-7541, 84-7671.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 16, 1984.
Decided Feb. 21, 1985.
 
 Guy B. Bailey, Jr., Miami, Fla. (Mercedes C. Busto, Bailey & Dawes, Miami, Fla., of counsel), for plaintiff-appellant.
 Henry F. Minnerop, New York City (Brown, Wood, Ivey, Mitchell & Petty, of counsel), for defendants-appellees.
 Before NEWMAN, CARDAMONE and DAVIS*, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 On this appeal we must determine whether a program devised by defendants Merrill, Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) and its wholly-owned subsidiary, Merrill Lynch Money Markets, Inc. (Money Markets), to sell bank certificates of deposit (CDs) is within the compass of the federal securities law. In Marine Bank v. Weaver, 455 U.S. 551, 102 S.Ct. 1220, 1221, 71 L.Ed.2d 409 (1982), the Supreme Court held that a conventional CD purchased from an issuing bank is not a security under the anti-fraud provisions of the federal securities laws. Nonetheless, the Court stated that each transaction must be analyzed on the content of the particular instrument involved and the factual setting as a whole. The possibility that in certain circumstances a CD might be a security within the scope of the federal securities laws was specifically left open. Id. at 560 n. 11, 102 S.Ct. at 1225 n. 11.
 
 
 2
 The complaint alleges that defendants publish the Money Market Information Bulletin, which tells prospective customers that Merrill Lynch has available negotiable, insured, and liquid $100,000 CDs, for which they will maintain a secondary market. Defendants advertise that they screen daily a large group of quality banks to provide their customers with CDs with "competitive" yields from a variety of issuers. They represent that they will monitor the creditworthiness of issuing banks on a regular basis, and they discourage potential customers from seeking to deal directly with those banks. If the allegations of plaintiff's amended complaint are true, this sales message might be characterized as artful, but certainly not candid.
 
 
 3
 Plaintiff, who purchased 12 of the $100,000 CDs, claims that these certificates are not those regularly available at the issuing banks. Instead, plaintiff asserts that these CDs are specially created, issued and sold only to Merrill Lynch customers. Most significantly, plaintiff alleges that the rates of interest on the Merrill Lynch CDs were lower than the rates paid by the banks on their ordinarily issued CDs and that defendants pocketed the difference between the rates as an undisclosed commission. From the gold that flows through a broker's hands, a small shaving may be taken as commission. Yet, credibility and confidence in the market may demand that the amount of this shaving be revealed to investors. At this early stage of the litigation, before any discovery, it is difficult to discern if there is merit to plaintiff's claims against these defendants. It is sufficient to say that in our view plaintiff's complaint states a cause of action and should not have been dismissed on defendants' motion for summary judgment.
 
 
 4
 * Plaintiff Gary Plastic Packaging Corporation (Gary Plastic) brought this action in the United States District Court for the Southern District of Florida, for itself and for all others similarly situated, against defendants Merrill Lynch and Money Markets. The action was transferred, pursuant to 28 U.S.C. Sec. 1404(a), to the Southern District of New York (Brieant, J.) in December 1983. The complaint contains four counts that allege violations of Secs. 5(a) and 17 of the Securities Act of 1933, Sec. 10(b) of the Securities Exchange Act of 1934, and the SEC's Rule 10b-5. One count alleges a civil RICO violation, 18 U.S.C. Sec. 1962(c). All allegations stem from the same transactions between Gary Plastic and Merrill Lynch. In its Money Market Information Bulletin, Merrill Lynch described its CD Program involving bank certificates of deposit[1] issued by both commercial and savings and loan institutions (referred to as banks) as follows:
 
 
 5
 FULLY INSURED $100,000 NEGOTIABLE CERTIFICATES OF DEPOSIT
 
 
 6
 Merrill Lynch Money Markets Inc. (MLMMI) is offering its customers a unique opportunity to purchase $100,000 negotiable certificates of deposit that are fully insured and liquid.
 
 INSURANCE COVERAGE
 
 7
 This opportunity, for individuals or corporate investors with $100,000 or more to invest, has been made possible as a result of recent changes in Federal Deposit Insurance Corporation (FDIC) and Federal Savings and Loan Insurance Corporation (FSLIC) regulations dealing with deposit insurance coverage. In essence, both the FDIC and FSLIC have raised their deposit insurance coverage to $100,000 from $40,000 per depositor per institution.
 
 SIGNIFICANCE
 
 8
 The extended coverage will enable an investor to purchase a $100,000 certificate of deposit from an FDIC or FSLIC insured commercial bank or savings and loan association and have the total principal amount of the investment covered by Federal deposit insurance. Carrying this a step further, one could distribute investible funds in $100,000 increments among a number of banks to ensure Federal deposit insurance coverage of the total amount. Investors can now purchase $100,000 negotiable certificates of deposit and enjoy the benefits of having their entire deposit insured by a Federal agency and at the same time take advantage of the exemption from interest rate ceilings that Regulation Q provides for certificates of deposit that are $100,000 or larger.
 
 A NEW OPPORTUNITY
 
 9
 MLMMI will provide its investors with an opportunity to take advantage of this regulatory change by offering, on a daily basis, a broad selection of fully insured $100,000 certificates of deposit issued by domestic commercial banks and savings and loan associations in a range of maturities. Each of the issuers whose certificates of deposit are offered has been reviewed and approved by the MLPF & S Corporate Credit Department and is monitored on a regular basis. Credit reports that provide an historical analysis on each issuer will be readily available through your MLPF & S Account Executive.
 
 LIQUIDITY
 
 10
 The $100,000 certificates of deposit that MLMMI is offering enjoy a high degree of liquidity since they are in negotiable bearer form and are fully insured by a Federal agency. In addition, MLMMI fully intends to maintain a secondary market for its customers which would enable them to sell their certificates of deposit back to MLMMI at prevailing market rates without the significant interest rate penalties Federal banking regulations require banks to impose on the early redemption of their certificates of deposit.
 
 ALTERNATIVES
 
 11
 The more popular alternatives would include Treasury Bills, Federal Agency Securities and Money Market Funds. With the increase in deposit insurance coverage, an investor now has the opportunity to purchase Federally insured certificates of deposit, an investment which usually carries higher yields than Treasury Bills and Federal Agency Securities. While money market funds do enjoy liquidity, they are not Federally insured and cannot guarantee a future rate of return.WHY MLMMI
 
 
 12
 Some investors may seek to purchase $100,000 certificates of deposit directly from a bank or savings and loan association. However, they can only call a few local banks at most, their alternatives are critically limited. You have no way of knowing if the banks you are calling are in the market trying to raise money at a competitive rate or if they are quoting a rate just to accommodate a depositor. Our specialized bank liability trading staff talks to a large group of pre-screened, quality banks daily before offering certificates of deposit to investors enabling MLMMI to provide the investor with certificates of deposit with competitive yields from a variety of issuers.
 
 
 13
 The interest rate penalties for early redemption imposed under Federal Banking regulations do not apply to certificates of deposit sold back to MLMMI. They do apply if you redeem your certificates of deposit prior to maturity at the issuing bank.
 
 
 14
 MLMMI intends to maintain a secondary market in these negotiable bearer certificates of deposit for its customers providing them with a source of liquidity at prevailing market rates.
 
 
 15
 In addition to the safety factor of having Federal insurance for these deposits, the highly professional MLPF & S Corporate Credit Department is monitoring, on a regular basis, those issuers whose certificates of deposit MLMMI offers and will provide a written credit analysis on each.
 
 
 16
 For additional information on this new program, contact your local Merrill Lynch Account Executive.
 
 
 17
 MERRILL LYNCH MONEY MARKETS INC.
 
 
 18
 When, in 1982, plaintiff ordered 12 CDs from Merrill Lynch,[2] Money Markets contacted financial institutions in various parts of the country, and purchased the CDs. For each certificate of deposit purchased, Gary Plastic received an order ticket and a confirmation slip from Merrill Lynch. The actual CDs were held by the "delivery agent," Manufacturers Hanover Trust Company, and when they matured Gary Plastic received all principal and interest due it under the terms of the confirmation slips.
 
 
 19
 On May 20, 1983, plaintiff brought this action. The gravamen of the complaint was that the interest rates shown on the customer confirmation slips were lower than the interest rates actually paid by the banks according to the terms of the deposit certificates. The complaint further asserted that while defendants in the Money Market Information Bulletin purported to perform its services free of charge, they actually retained the difference between the rate shown on the confirmation slip and the actual certificate of deposit rate as an "excessive, undisclosed commission." Plaintiff further charged that the Bulletin omitted and misrepresented material facts in violation of the antifraud provisions of the 1933 and 1934 Acts and that in violation of Sec. 5(a) of the 1933 Act, defendants sold the CDs when no registration statement was in effect.
 
 
 20
 On April 17, 1984 plaintiff's counsel met informally with Merrill Lynch employees and, for the first time, learned how Merrill Lynch operated its CD Program. Although the information plaintiff obtained during that meeting was far from complete, plaintiff realized that some of the factual assumptions upon which its complaint was based were incorrect. The complaint's premise that the confirmation slips and the certificates of deposit stated different rates of interest was inaccurate. In its proposed amended complaint plaintiff has set forth the facts that came to light during the meeting. Essentially, Merrill Lynch determines on a given day the lowest interest rate it can market (the "competitive" rate) and has its subsidiary Money Markets purchase CDs in bulk from various banks at that rate. The banks specially create these CDs for Money Markets and Merrill Lynch markets them to its customers. Money Markets pays a commission to Merrill Lynch for the sale. Merrill Lynch furnishes its customer with a confirmation slip indicating that it acted as agent on its customer's behalf.
 
 
 21
 Plaintiff claims that the wrong in all of this is that Merrill Lynch never informed customers that the issuing bank was actually paying on its regularly issued CDs a rate of interest higher than the rate set on the instruments created for and marketed by Merrill Lynch. For example, plaintiff introduced evidence that Pacific Federal offered 15% interest to customers who purchased CDs directly from it, as compared to the 13.8% interest paid plaintiff on the CD it bought through Merrill Lynch. Similarly, State Savings Stockton was offering 16.1%, while plaintiff received only 14.5%, and Northern California Savings was offering 14.75%, while plaintiff earned only 13.8%. Money Markets collects the difference between the rates a bank agrees to pay on its regular CDs and the lesser amount it pays on CDs marketed by Merrill Lynch. Thus, plaintiff claims Merrill Lynch pooled funds and used its market power not to obtain the best rates available that day for its customers, as its literature implied, but instead to advance its own economic advantage.
 
 
 22
 Just one week after their informal meeting in April 1984, the parties appeared at a hearing before the district judge. Plaintiff told the court that it had new information on the operation of the CD Program and that the program's operation was based on a "factual pattern" that was "slightly different from that that [plaintiff] had envisioned" when drafting the complaint 11 months earlier. On April 30 defendants submitted portions of the confirmation slips and an affidavit explaining that the rates stated on the confirmation slips matched the rates on the certificates of deposit. Defendants' documents confirmed what plaintiffs had already conceded, that the original complaint was based upon an incorrect factual predicate.
 
 
 23
 Fifteen days later, before plaintiff had submitted answering papers, the district court granted summary judgment to defendants. The court concluded that the complaint was based on unfounded allegations and that the transaction did not involve a "security" within the meaning of the 1933 and 1934 Acts. [Current] Fed.Sec.L.Rep. (CCH) p 91,490 (S.D.N.Y. May 15, 1984). In July plaintiff moved to set aside the judgment under Fed.R.Civ.P. 59(e) or 60(b), and to amend its complaint under Rule 15. Plaintiff's proposed amended complaint alleged the same four counts as its initial complaint, but was based on the information plaintiff had obtained one week prior to the April 24 hearing. The court denied the Rule 59(e) motion because it was untimely. See Fed.R.Civ.P. 59(e) ("A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment"). The Rule 60 motion was also denied because plaintiff did not present "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." Fed.R.Civ.P. 60(b)(2).
 
 
 24
 Plaintiff appeals, urging that the district court's grant of summary judgment and refusal to grant leave to amend the complaint was an abuse of discretion, that the certificates of deposit sold through the CD Program were "securities" under the federal securities laws, and that its amended complaint states a viable claim for securities fraud. We reverse the judgment below and remand the case to the district court for further proceedings on the merits.
 
 II
 
 25
 Plaintiff argues that the district court improperly granted defendants' motion for summary judgment under Fed.R.Civ.P. 56. Plaintiff asks that we reverse that order and remand with leave to amend the complaint under Fed.R.Civ.P. 15. We conclude that it was an abuse of the trial court's discretion to grant summary judgment when plaintiff had moved to amend its complaint and had not conducted discovery in this complex securities matter.
 
 
 26
 While summary judgment is a valuable procedural device for promptly disposing of actions in which there is no genuine issue as to any material fact, it is also a drastic remedy that cuts off the right to have one's day in court. Heyman v. Commerce and Industry Insurance Co., 524 F.2d 1317, 1320 (2d Cir.1975). The harshness of the remedy is exacerbated when the trial court refuses to allow plaintiff to conduct discovery. Discovery serves important purposes, such as avoiding surprise, fully disclosing the nature and scope of the controversy, narrowing, simplifying, and framing the issues involved, and enabling parties to obtain the factual information needed to prepare for trial. 8 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2001 (1970). Rules governing discovery should be interpreted broadly to achieve those purposes. See, e.g., Schlesinger Investment Partnership v. Fluor Corp., 671 F.2d 739, 742 (2d Cir.1982) ("The federal rules evince a liberal policy with regard to discovery in order to allow litigants to secure helpful evidence from the hands of their adversaries"). It follows that summary judgment should be sparingly granted in securities fraud cases when discovery is incomplete and under circumstances where, as here, defendants have exclusive possession of the material facts. See Schlesinger Investment Partnership, 671 F.2d at 743; George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 555 (2d Cir.1977); Schoenbaum v. Firstbrook, 405 F.2d 215, 218 (2d Cir.1968) (in banc), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). Rather, in the preliminary stages of the lawsuit, the trial court should permit discovery and freely grant leave to amend the complaint under Rule 15. Fed.R.Civ.P. 15(a) ("leave [to amend] shall be freely given when justice so requires"). See Foman v. Davis, 371 U.S. 178, 181, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962); Goldberg v. Meridor, 567 F.2d 209, 213 (2d Cir.1977), cert. denied, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978) ("the undesirability of granting summary judgment to defendants in a stockholder's derivative suit before discovery has been completed ... dictate[s] liberality in allowing such complaints to be amended to reflect facts already discovered").
 
 
 27
 In dismissing the complaint, the trial court concluded that the factual predicate of the complaint--that the interest rates stated on the confirmation slips were less than the interest rates stated on the certificates of deposit--was not correct. Merrill Lynch's unrefuted evidence showed that the interest rates stated on the certificates of deposit purchased by Gary Plastic were identical to the rates shown on the corresponding confirmations. Plaintiff had learned at the April 17 meeting that this factual predicate was incorrect. Instead of continuing to argue plaintiff's initial position, counsel informed the district court that new facts had come to light and sought leave to amend the complaint.
 
 
 28
 Dismissal of the case at that point, without further opportunity to conduct discovery, was an abuse of discretion. With the exception of one informal meeting and a few incomplete "audit trail" documents, plaintiff has not obtained information from a single Merrill Lynch officer or bank officer. Thus, it has been forced to proceed without knowledge of many material facts. For example, plaintiff has yet to learn important details of the operation of the CD Program, such as the precise amount and derivation of the commissions Merrill Lynch received, the specific roles played by Merrill Lynch and its subsidiaries, and the exact nature of the dealings between Merrill Lynch and the various banking institutions. That the district judge had some knowledge of plaintiff's inability to obtain information is clear from the fact that he ordered Merrill Lynch to file confirmation slips and other documentary evidence of the transactions with its customers. To resolve this dispute, Merrill Lynch's relationship with its customers and the banks should be further explored. Plaintiff should have the opportunity to incorporate its newly obtained facts into its amended complaint to correct the factual predicate of its original complaint.
 
 III
 
 29
 In its amended complaint plaintiff will charge that defendants have violated Sections 5(a) and 17 of the 1933 Act, 15 U.S.C. Secs. 77e(a), 77q, and Section 10(b) of the 1934 Act, 15 U.S.C. Sec. 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. Sec. 240.10b-5 (1984). Section 5 of the 1933 Act prohibits the sale of a "security" unless a registration statement is in effect. Section 17(a) of the 1933 Act and Section 10(b) of the 1934 Act are the antifraud provisions of the securities acts, prohibiting the use of any scheme to obtain money by means of an untrue statement or omission to state a material fact or of any manipulative or deceptive device in connection with the purchase or sale of any "security." Hence, as a threshold matter, in the application of both federal acts, plaintiff must show that the transactions involved a "security." Plaintiff argues that the CDs sold through the CD Program are "securities" within the meaning of the Acts. We undertake now to resolve that important issue.
 
 A. Background of Securities Acts
 
 30
 In 1933 and 1934, in the wake of the 1929 stock market crash, Congress enacted a comprehensive regulatory scheme to eliminate abuses in the nation's financial markets. The two Acts passed in those years were designed to provide investors with material information and to protect the investing public from the sale of worthless securities through misrepresentation. H.R.Rep. No. 85, 73d Cong., 1st Sess. 1-5 (1933); United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). The legislation was intended to encourage "honest dealing in securities and thereby bring back public confidence" in the investment markets and to eliminate the "unethical and unsafe practices of bank and corporate officers." Letter from President Franklin D. Roosevelt to Congress (March 29, 1933), reprinted in 77 Cong.Rec. 937 (1933). As part of the regulatory reformation, Congress enacted the Banking (Glass-Steagall) Act of 1933, 12 U.S.C. Secs. 227 et seq., which separated investment banking and deposit banking. The Glass-Steagall Act created the Federal Deposit Insurance Corporation (FDIC) to insure bank depositors against loss and created a thorough plan that regulated virtually all aspects of deposit banking institutions. The financial transactions at issue, which involve both an investment marketing firm and instruments issued by banking institutions must be analyzed in light of this regulatory design.B. Definitions of "Security" Under the Acts
 
 
 31
 The securities acts define "security" in Section 2(1)[3] of the 1933 Act, 15 U.S.C. Sec. 77b(1), and Section 3(a)(10)[4] of the 1934 Act, 15 U.S.C. Sec. 78c(a)(10). Although the precise wording of the two definitional sections differs, the Supreme Court has consistently held that the definitions are virtually identical and the coverage of the two Acts may be considered the same. See Marine Bank, 455 U.S. at 555 n. 3, 102 S.Ct. at 1223 n. 3; United Housing Foundation, 421 U.S. at 847 n. 12, 95 S.Ct. at 2058 n. 12; Tcherepnin v. Knight, 389 U.S. 332, 342, 88 S.Ct. 548, 556, 19 L.Ed.2d 564 (1967). The definitions of "security" are broad and ambiguous; they allow courts to use a flexible approach "to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits." SEC v. W.J. Howey Co., 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946); see United Housing Foundation, 421 U.S. at 847-48, 95 S.Ct. at 2057-59 (Congress "sought to define 'the term security in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' ") (quoting H.R.Rep. No. 85, 73d Cong., 1st Sess. 11 (1933)). Although courts should construe the statutes broadly, because they are remedial, they should keep in mind that to afford the securities laws too wide a reach over banking institutions could overburden that already extensively regulated industry.
 
 
 32
 Numerous tests have been applied to determine whether various instruments described as "notes" or "stock" fall within the scope of the definition, such as the "economic reality" test, see W.J. Howey Co., 328 U.S. at 299, 66 S.Ct. at 1103, the "commercial/investment" test, see McClure v. First National Bank, 497 F.2d 490, 493 (5th Cir.1974), and the "risk capital" test, Landreth Timber Co. v. Landreth, 731 F.2d 1348, 1352 (9th Cir.1984). Our circuit stands alone in applying a more literal approach, see Exchange National Bank v. Touche Ross & Co., 544 F.2d 1126, 1137-38 (2d Cir.1976); Seagrave Corp. v. Vista Resources, Inc., 696 F.2d 227, 229 (2d Cir.1982). We need not address the continued applicability of these tests because in Marine Bank the Supreme Court applied the definition of security to facts so similar to those in the present case that we are bound by its reasoning to the exclusion of criteria articulated in other contexts. See Wolf v. Banco Nacional de Mexico, S.A., 739 F.2d 1458, 1461 (9th Cir.1984), cert. denied, --- U.S. ----, 104 S.Ct. 784, 83 L.Ed.2d 778 (1985) (court relied on Marine Bank criteria to find that Certificate of Deposit issued by a Mexican bank was not a security).
 
 
 33
 Of the several types of instruments defined as securities, the financial instruments here most clearly resemble "investment contracts." The Supreme Court first interpreted the definition of "investment contract" in SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). See Note, The Definition of Security: Marine Bank v. Weaver, 24 B.C.L.Rev. 1053 (1983) (overview of the Supreme Court's decisions defining investment contract). Joiner involved a widely circulated offer to sell assignments of oil leases. In holding that the contracts to sell those lease assignments were investment contracts, the Court focused on whether they were "widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a "security." ' " 320 U.S. at 351, 64 S.Ct. at 124. The Court stated that the test is "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." Id. at 352-53, 64 S.Ct. at 124-25 (quoted in Marine Bank, 455 U.S. at 556, 102 S.Ct. at 1223). See Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027 (2d Cir.1974) (where defendants sold whisky warehouse receipts, and stored, insured, marketed, and sold the whisky for the purchasers, the whisky warehouse receipts were found to be "investment contracts").
 
 
 34
 In W.J. Howey Co., the Supreme Court narrowed the Joiner "character in commerce" test, stating specific requirements that continue to be the analytical foundation for determining what constitutes an investment contract. In that case defendants sold acreage in its citrus grove under a contract pursuant to which a W.J. Howey Co. subsidiary cultivated, harvested, and marketed the citrus crops. The Court held that the contracts were investment contracts within the meaning of the 1933 Act. The Howey Court stated: "[A]n investment contract ... means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promotor or a third party...." 328 U.S. at 298-99, 66 S.Ct. at 1102-03.
 
 
 35
 In Marine Bank v. Weaver, the Supreme Court added a further limiting requirement to the Howey test: for an instrument to be a security the investor must risk loss. The Court held that a conventional certificate of deposit was not a security under the federal securities acts because federal banking regulations and the FDIC eliminate all risk of loss to the investor. The court below concluded that the CDs in this case are not different from those in Marine Bank and that neither the CDs nor the CD Program is a security under federal law. We disagree.
 
 
 36
 In Marine Bank plaintiffs purchased a $50,000 six-year certificate of deposit from defendant Marine Bank, a federally regulated Pennsylvania bank. Plaintiffs pledged the CD to Marine Bank to guarantee a loan made by the bank to Columbus Packing Co. In consideration for guaranteeing the loan, the Weavers contracted with the owners of Columbus to receive $100 per month, 50% of Columbus' net profits, and the use of a barn and pasture. They also were given the right to veto future borrowing by Columbus. When Columbus failed and the bank prepared to claim the CD, plaintiffs sued the bank, alleging, inter alia, that the bank had violated the anti-fraud provisions of the 1934 Act, 15 U.S.C. Sec. 78j(b). Plaintiffs claimed that the bank had told them that Columbus would use the loan as working capital, but instead the loan was immediately applied by the bank against Columbus' overdue obligations. 455 U.S. at 553. The Supreme Court rejected the Third Circuit's conclusion that this certificate of deposit is similar to any other long-term debt obligation commonly found to be a security and held that the CD was not a security. In a footnote the Court added the following caveat:
 
 
 37
 It does not follow that a certificate of deposit ... invariably falls outside the definition of a "security" as defined by the federal statutes. Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole.
 
 
 38
 Id. at 560 n. 11, 102 S.Ct. at 1225 n. 11. The crux of the Marine Bank decision is that federal banking regulations and federal deposit insurance eliminate the risk of loss to the investor, thereby obviating the need for the protection of the federal securities laws. Id. at 558-59, 102 S.Ct. at 1224-25. In addition, the Court held that the private agreement between plaintiffs and the owners of Columbus, negotiated one-on-one, was not a security because of its unique character and highly personal terms. The CDs issued by Merrill Lynch present an entirely different picture.
 
 
 39
 C. The CDs Sold Through the CD Program are "Securities"
 
 
 40
 under the Howey Test and Marine Bank
 
 
 41
 In the present case, the certificates of deposit sold through the CD Program satisfy the Howey test for determining what constitutes an investment contract within the meaning of the Acts. Gary Plastic invested $1,200,000 in its CD purchases. By investigating issuers, marketing the CDs, and creating a secondary market, Merrill Lynch was engaged in a common enterprise within the meaning of Howey. Finally, investors such as Gary Plastic expect profits derived solely from the efforts of Merrill Lynch and the banks. Plaintiff's investment in the CD Program was motivated by the expectation of a return of cash investment, the potential for price appreciation due to interest rate fluctuations, and the liquidity of these highly negotiable instruments.
 
 
 42
 Merrill Lynch is engaged in activity that is significantly greater than that of an ordinary broker or sales agent. Since Merrill Lynch possesses significant economic power, it is able to negotiate with the issuing banks to obtain a favorable rate of interest. Pursuant to defendants' scheme, the banks create new CDs that carry interest rates lower than those they pay their direct customers. From this differential, Merrill Lynch receives a commission for its services, which include providing a secondary market and cultivating a large group of banks that desire to borrow money. Therefore, a significant portion of the customer's investment depends on Merrill Lynch's managerial and financial expertise.
 
 
 43
 The customers rely on the skill and financial stability of Merrill Lynch for a number of reasons. First, resale in the secondary market created and maintained by Merrill Lynch is crucial to the investor. If, for example, Merrill Lynch were to become insolvent and investors were unable to sell their CDs in the secondary market, they would lose two significant advantages: liquidity and capital appreciation. Ordinary CDs purchased directly from the issuing bank are not freely redeemable prior to maturity. Those redeemed before maturity are subject to a substantial withdrawal penalty. Thus, these CDs sold through the CD Program afford the investor a high degree of liquidity that it would not otherwise have. More importantly, by purchasing through the CD Program the investor has the option of selling its CD back to Merrill Lynch if prevailing interest rates drop, thereby realizing profits from capital appreciation. In the event Merrill Lynch failed to maintain the promised secondary market, an investor would have considerable difficulty liquidating a CD.
 
 
 44
 Second, the investor relies on Merrill Lynch's implicit promise to maintain its marketing efforts. The success of the secondary market and the availability of CDs at competitive rates hinge on Merrill Lynch's success in finding new buyers of CDs and developing strong working relationships with issuing banks. If Merrill Lynch were not an influential and well-known participant in the marketplace, the CD Program would not be viable.
 
 
 45
 Finally, investors rely on Merrill Lynch's ongoing monitoring of the issuing banks. If an issuing bank becomes insolvent, the FDIC or FSLIC will pay the investor the principal due under the terms of the certificate of deposit.[5] Here investors are buying something more than an individual certificate of deposit. They are buying an opportunity to participate in the CD Program and its secondary market. And, they are paying for the security of knowing that they may liquidate at a moment's notice free from concern as to loss of income or capital, while awaiting for FDIC or FSLIC insurance proceeds.
 
 
 46
 Plaintiff's decision to invest is obviously made in reliance upon the efforts, knowledge and skill of Merrill Lynch. This is a significant factor that sets this case apart from Marine Bank. At the outset Marine Bank acknowledges that it is dealing with a "conventional certificate of deposit," 455 U.S. at 552, 102 S.Ct. at 1221. In the present case, defendant's executive vice-president is alleged to have characterized the CD created and sold through the CD Program as wholly different from an ordinary certificate of deposit. The Weavers dealt with the issuing bank. As a result, the FDIC protected them fully against any risk of loss due to the insolvency of the bank from which they expected to derive their profits. The CD Program investor relies not only on the future solvency of the issuing bank, but also on the future solvency of Merrill Lynch to enjoy the unique benefits of this investment opportunity. The federal banking laws, including the FDIC, do not eliminate the risk to the CD Program investor. These investors are not "abundantly protected" under the federal banking laws. Like the holder of an ordinary long-term obligation, the CD Program investor assumes the risk of insolvency of defendants as unregulated borrowers. Unlike Marine Bank, federal securities fraud protection in this case is not a double-coating. Rather, absent the securities laws, plaintiff has no federal protection against fraud and misrepresentation by the defendants in the marketplace.
 
 
 47
 Further, the CD Program is not excluded from being a security by the uniqueness restriction of Marine Bank. It contains no unique terms such as the veto power over future borrowing or use of a barn and pasture contained in the agreement in Marine Bank. It is not a one-of-a-kind arrangement. Instead the CDs sold through the CD Program are offered to the public at large, travel through the public markets and have the equivalent value to most persons. Hence, the uniqueness restriction found in Marine Bank is not present here.
 
 
 48
 The result we reach is consonant with the comprehensive financial regulatory plan enacted by Congress in 1933 and 1934. The Glass-Steagall Act separated large private banks, whose chief business was investment, from deposit banks. See 77 Cong.Rec. 3730 (1933). See generally Note, Bank Certificate of Deposit: Notes not in Tune with Securities Regulation, 10 Fordham Urban L.J. 469, 476-77 (1982). The CDs sold through the CD Program represent essentially a joint effort between the issuer of the CD, the deposit bank, and Merrill Lynch as the market maker, the investment bank. Investors put their money and confidence in the financial and managerial expertise of both institutions. They receive returns from both: interest payments from the deposit bank and services such as credit checks and negotiability from the investment bank. The banking laws protect investors from the abuses and misrepresentations of the former. The securities acts regulate the latter.
 
 
 49
 In Marine Bank, the reason for exempting certificates of deposit from the securities acts was to eliminate double coverage when the Glass-Steagall Act and the securities acts overlap. Were we to find the CDs sold through this CD Program not to be covered by the federal securities laws, a gap would exist in the regulatory scheme that would strip the investor of needed federal protection. The "content of the instruments in question, the purposes intended to be served, and the factual setting as a whole" make this an appropriate case for finding these instruments to be within the definitions of "security." See Marine Bank, 455 U.S. at 560 n. 11, 102 S.Ct. at 1225 n. 11. See also H.R. No. 626(I), 97th Cong., 2d Sess. 9-10, reprinted in 1982 U.S.Code Cong. & Ad.News 2780, 2788 (Marine Bank left "open the question of whether a certificate of deposit could be a security in another context"). Therefore, we hold that the certificates of deposit issued and sold pursuant to defendant Merrill Lynch's CD Program are "securities" for purposes of the antifraud provisions of both Acts.
 
 IV
 
 50
 Once amended, plaintiff's complaint will state a triable claim. See McLain v. Real Estate Board of New Orleans, Inc., 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980). There should be further proceedings to determine whether Merrill Lynch's Information Bulletin is deceptive because of its alleged failure to disclose material issues of fact required under the federal securities acts. See, e.g., Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) (defendants' failure under particular facts to state that they were market makers was a violation of Rule 10b-5); Glen-Arden Commodities, 493 F.2d at 1032 (affirming a preliminary injunction against defendants engaged in a whisky warehouse receipt brokerage scheme based, among other things, on defendants' failure to inform its customers that they were charging prices considerably in excess of the prices charged by other brokers). We express no opinion as to whether defendants' acts actually violated the antifraud provisions of the securities laws, as that is the issue that must be decided by the trial court.
 
 
 51
 Plaintiff should also have a chance to prove that the CDs it purchased did not yield the "competitive" (some would read this as "best available") interest rates promised by the Information Bulletin. In the Information Bulletin, Merrill Lynch plainly holds itself out as agent for its customer. The confirmation slip sent to its customers states that Merrill Lynch "made this transaction as your agent." Yet, at the April 24 hearing Merrill Lynch's counsel stated that one of its subsidiaries "acts as the agent for the issuing institution." An affidavit of the executive vice-president of Money Markets confirms that Money Markets acts as agent for issuing institutions and was paid commissions by them. These circumstances might lead an investor to believe that Merrill Lynch served at the same time as agent for two masters. Because banks and investors like plaintiff have different objectives respecting CD interest rates, an agent for both will tend to prefer one over the other.
 
 
 52
 Commissions that defendants receive on the CDs they sell to the public are relevant and must be disclosed. It is not clear from the record the extent of defendants' commissions, although several are mentioned. For example, in addition to the interest it earned on the flow of funds through its hands, Merrill Lynch received commissions at the end of each month from issuing banks for the funds placed with it. It also may have received all or a portion of the differential in the interest rate the bank would have paid on a given day and the claimed lesser amount the bank paid on CDs created for defendants. Plaintiff argues that if this is the case, then it was actually paying Merrill Lynch an undisclosed commission.[6]
 
 
 53
 Accordingly, the judgment of the district court is reversed and the case is remanded with directions to reinstate the complaint, as amended, and for further proceedings consistent with this Opinion.
 
 
 
 *
 Honorable Oscar H. Davis, Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 As defined in federal regulations,
 [t]he term "time certificate of deposit" means a deposit evidenced by a negotiable or nonnegotiable instrument which provides on its face that the amount of such deposit is payable to bearer or to any specified person or to his order:
 (1) On a certain date, specified in the instrument, not less than 30 days after the date of the deposit, or
 (2) At the expiration of a certain specified time not less than 30 days after the date of the instrument, or
 (3) Upon notice in writing which is actually required to be given not less than 30 days before the date of repayment, and,
 (4) In all cases only upon presentation and surrender of the instrument.
 
 
 [12]
 C.F.R. Sec. 217.1(c) (1951)
 A certificate of deposit is a receipt for the deposit of funds in a bank of which there are two classes, demand and time. Demand certificates of deposit are payable on demand, and time certificates of deposit are payable on a specified date, or so many days after date, upon proper indorsement. These time certificates are similar to savings deposits, but have a definite maturity, and are evidenced by a certificate instead of a passbook entry. Time certificates of deposit may bear interest, and are, therefore, a convenient means of investing temporarily idle funds, which otherwise would be unemployed.
 G. MUNN. ENCYCLOPEDIA OF BANKING OF FINANCE 178-79 (F.L. Garcia rev. ed. 1973).
 
 
 [2]
 
 Trade Date Issuer Amount Rate Maturity
5/20/82 Imperial Bank of Los Angeles $100,000 13.70% 6/21
5/20/82 Home Savings & Loan 100,000 13.80% 6/21
5/20/82 Northern California Savings & 100,000 13.80% 6/21
 Loan
5/20/82 Pacific First Federal Savings & 100,000 13.80% 6/21
 Loan
5/25/82 World Savings & Loan 100,000 13.35% 6/25
5/28/82 Imperial Savings & Loan 100,000 13.35% 6/25
6/18/82 Northern California Savings 100,000 14.50% 7/21
6/18/82 State Savings Stockton, CA 100,000 14.50% 7/21
6/24/84 Sumitoma Bank of California 100,000 14.60% 8/24
6/24/82 World Savings & Loan 100,000 14.60% 8/24
6/30/82 Great Western Savings 100,000 14.50% 8/2
7/20/82 Imperial Savings & Loan 100,000 12.55% 10/19
 
 
 [3]
 When used in this subchapter, unless the context otherwise requires--
 (1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.
 
 
 [4]
 When used in this chapter, unless the context otherwise requires--
 (10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, any put, call straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing, but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.
 
 
 [5]
 We note that two of the CDs purchased by plaintiffs apparently had a face value above $100,000--$10,000 in one instance and $2,000 in the other. Federal insurance is unavailable for amounts above $100,000 in the event of insolvency
 
 
 [6]
 We do not address plaintiff's claim under Sec. 5(a) of the 1933 Act, 15 U.S.C. Sec. 77e(a). On remand, the district court should determine the Act's registration requirements on the CDs sold through the CD Program and the applicability of any exemptions from registration. See 15 U.S.C. Sec. 77c(a)(2), (a)(5). See also SEC No Action Letter, Merrill Lynch, Pierce, Fenner & Smith, Inc., 14 Sec.Reg. & L.Rep. (BNA) No. 46, at 2053-54 (Nov. 26, 1982); Management Corp. of America, 14 Sec.Reg. & L.Rep. (BNA) No. 16 (April 23, 1982). Nor do we address the RICO claim alleged in plaintiff's complaint. The district court will have further opportunity to rule upon this claim in light of existing law when this matter is again before it