In the Matter of NORTH AMERICAN CATTLE CO., Debtor.

Bankruptcy No. HG 85 00266.

United States Bankruptcy Court, W.D. Michigan.

July 22, 1985.

Day, Sawdey, Flaggert and Porter, James Frakie, Grand Rapids, Mich., for debtor.

Varnum, Riddering, Schmidt and Howlett, Jeffrey R. Hughes, Grand Rapids, Mich., for the Investors Committee.

Walsh, Miller, Rayman and Langeland, Steven L. Rayman, Kalamazoo, Mich., for the Trade Creditor Committee.

## OPINION

LAURENCE E. HOWARD, Bankruptcy Judge.

The debtor has moved this Court for permission to disburse lease payments to the investors for whom the payments were collected. The trade creditors' committee objected that the investors were "de facto" owners of the debtor; therefore the lease payments would be property of the estate under 11 U.S.C. § 541, and the investors' claims would be subordinated under 11 U.S.C. § 510(b) & (c). The investors' committee has filed a motion for summary judgment on the objection under Bankruptcy Rules 9014 and 7056.

An examination of the pleadings, affidavits, and depositions submitted in this case reveals the following story. North American Cattle Corporation ("NACC") has offered a dairy cow leasing program to the public as an investment since at least 1980. Under this program, the investor would purchase a certain number of cows from NACC, often through an intermediate. The investor would receive a bill of sale for that number of cows. Each cow was given an orange ear tag with an identification number on it, and these numbers would be reported to the investor on the bill of sale. Meanwhile NACC would have located a farmer interested in leasing the dairy cows. NACC would deliver the cows directly to the farmer. The farmer and investor would then execute a lease. The investor invariably would also execute an Inspection and Reporting Service Agreement ("IRSA") with NACC. This agreement authorized NACC to collect the lease payments from the farmers and forward them to the investor, less a service charge.

Although NACC maintained the flow of payments to the investors until late 1984, upon the filing of the petition under Chapter 11 it became apparent that there were fewer cows than there were leases and that many farmers had ceased paying their rents. The debtor never informed the investors of this situation prior to filing its petition. The debtor-in-possession continued to collect rents from those farmers who were still paying. The debtor then decided to abrogate its IRSA's and turn over the rents already collected to the investors who owned the cows the rents were paid on. The debtor so moved the court.

The trade creditors' committee objected to the debtor's motion, claiming that the investors are "de facto shareholders" (Brief in Support of Trade Creditors Committee's Objection, at page 2), that the cows and the lease payments are property of the estate under 11 U.S.C. § 541, and that the investors' claims should be subordinated under 11 U.S.C. § 510(b) & (c). The trade creditors' committee argued all these points in opposition to summary judgment, and also maintained that summary judgment would be inappropriate at this time because it had not yet completed dis-

covery. The investors admit that they may own "securities within the definition of 11 U.S.C. § 101(41), but deny the trade creditors' committee's other allegations.

For the purposes of this opinion the Court shall assume that the investors do own securities of the debtor.

■ The Court cannot agree with the trade creditors that if the investors own a security, it is stock. The Supreme Court has identified five attributes of common stock: "(i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value." *Landreth Timber Company v. Landreth*, — U.S. —, 105 S.Ct. 2297, 2302, 85 L.Ed.2d 692 (1985). The uncontested affidavits filed along with supporting documents by many investors make it clear that the investors had no voting rights in the debtor. The investors did have certain rights as principals by virtue of the IRSA's which made NACC their agent, but they could not thereby control the company, nor did their rights vary in proportion to the number of cows owned. The supporting documents also make it clear that the funds received by the investors were not "dividends contingent upon an apportionment of profits" but were actually the forwarded lease payments, which varied according to the different terms set by various leases, and then reduced by the service charge of five dollars per month per cow leased. One might argue that the cows could be negotiated or pledged, and that the cows could appreciate in value. But the cow is not the security. Rather, the security is the relationship between the issue and the purchaser created by the transaction. The relationship created here was at most a management contract, which might be negotiated or pledged, but which could not appreciate in and of itself. If the relationship is a security, it is most likely an investment contract as defined in *Securities and Exchange Commission v. W.J. Howey Company*, 328

U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), as "an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.*, at 301, 66 S.Ct. at 1104.

The Court is not deciding the question of whether or not the investors hold a security, let alone the question of whether it would be an investment contract. Rather, the observations demonstrate that whatever the investors' relationship with the debtor, they are not shareholders of the debtor. The trade creditors' committee has argued that the investors are shareholders who own a share in the equity of the debtor, and that the debtor owns the cows. However, the investors are plainly not shareholders. Nor does the debtor own the cows. The debtor sold the cows to the investors, and gave each investor a bill of sale which identified the cows the investor owned. The lease ran from the investor to the farmer, and provided that the farmer would pay a certain rent per cow, pay transportation costs, replace deceased cows, care for and maintain the cows, etc. The IRSA's gave the debtor no rights in the cows nor any responsibility for them. If NACC indemnified the debtor in any way for a farmer's default the IRSA provided that it was purely as a volunteer and to the extent of the indemnity NACC was subrogated to the investor's rights against the farmer. The investor owned the cows and although he shifted many of the responsibilities of ownership, it was to the farmer, not the debtor. The investors are not shareholders of the debtor, nor are the cows and their lease proceeds corporate property of the debtor.

The discussion above also disposes of the trade creditors' committee's argument that under § 541 the cows and the lease proceeds are property of the debtor. Section 541 provides that all property in which the debtor had a legal or equitable interest at the commencement of the case becomes property of the estate to the extent of that interest. At oral argument the trade creditor's counsel was unable to identify any interest of the debtor in the cows and pro-

ceeds other than his shareholder argument rejected above. Even if the investors own securities of the debtor, nothing in either the Bankruptcy Code nor the federal security laws makes the cows property of the issuer. The investors bought and paid for the cows, and the cows still belong to them even if the investors hold stock, investment contracts, or any other security of the debtor.

Section 510(b) provides that when assets of the estate are distributed any claim "arising from recission of a purchase or sale of a security of the debtor ... [or] for damages arising from the purchase or sale of such a security" shall be subordinated to all claims senior to the interest which caused the damage or was rescinded. In short, if the investors were attempting to rescind their purchase of an investment contract and reclaim the pride they paid for it from NACC, those claims, if successful, would not be paid until the senior trade creditors had been paid. Section 510(b) is inapplicable to the instant situation. The investors are not attempting to rescind any security purchase, nor are they trying to reclaim the price they paid for any security. Further, they do not seek any distribution of property of the estate, nor do they assert a claim against any property of the estate. The cows and the lease proceeds belong to the investors, not the debtor.

■ As to § 510(c), it provides that the Court may subordinate for purposes of distribution any claim under the general principles of equitable subordination. This subsection is also inapplicable because there is no distribution of property of the estate involved here.

■ Nor does the Court believe it can or should invoke against the investors any general equitable powers the Court has. The trade creditors have conceded in their brief (Brief in Support of Trade Creditor Committee Objection, p. 11) and at oral argument that the investors have committed no inequitable acts. Equitable relief can only be given where there is inequitable conduct which harms another party. *Benjamin v. Diamond (In the Matter of Mobile Steel Co.)* 563 F.2d 692 (5th Cir. 1977). Equitable relief in the absence of inequitable conduct would be an abuse of discretion.

The trade creditors rely upon the article *The Interface Between Securities Regulation and Bankruptcy-Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors,* 48 N.Y.U.L.Rev. 260 (1973), by Professors John J. Slaine and Homer Kripke, for the proposition that equity security holders should be subordinated in all respects to the creditors. Even if the investors are equity security holders, however, Professors Slaine and Kripke were speaking in the context of claims based upon recission of that interest. As was noted above, such a situation is not before the Court at this time. Further, under the Slaine and Kripke analysis such a subordination would result from the creditors' reliance upon that equity in giving the debtor credit. At oral argument counsel for the creditors' committee stated that he was not aware of any representations that the debtor owned the cows, nor any reliance upon such representations by the creditors.

Summary judgment is a radical remedy and should "be sparingly granted ... when discovery is incomplete." *Gary Plastic Packaging Corp. v. Merrill, Lynch, Pierce, Fenner and Smith, Inc.,* 756 F.2d 230, 236 (2d Cir.1985). Nonetheless, it is justified in this proceeding. Counsel for the trade creditors' committee has stated that if he were allowed to complete his discovery he would seek to learn more about how NACC operated and where all the money it received went. Further discovery, however, would not change the resolution of this case. It might be revealed that the investors were, contrary to their affidavits, more like shareholders than owners of investment contracts, but they would still own the cows directly in their own right in either case. Nor should the trade creditors need discovery to uncover any reliance on their own part upon any fraudulent representations by the debtor that it owned the cows. The trade credi-

tors have objected on the grounds that the investors are security holders of the debtor who must then be subordinated to the creditors. The facts necessary to resolve this case are either undisputed or have been examined in light most favorable to the trade creditors.

Summary judgment is given in favor of the investors. The debtor's petition to disburse the lease payments shall not be hindered by this objection.