BANCO ESPANOL de CREDITO, Banco Totta & Acores, Banesto Banking Corp., Girozentrale Und Bank Der Osterreichischen Sparkassen AG, Harmony Gold Ltd. Hong Kong, International Commercial Bank of China, Monroe Bank & Trust, Phelps Dodge Corporation, Saudi American Bank, and State Street Bank & Trust Company as Master Trustee for the Retirement Plans of Atlantic Richfield Company and Certain of its Subsidiaries, Plaintiffs,

v.

SECURITY PACIFIC NATIONAL BANK and Security Pacific Merchant Bank, Defendants.

The HACHIJUNI BANK, LTD., Plaintiff,

v.

SECURITY PACIFIC NATIONAL BANK and Security Pacific Merchant Bank, Defendants.

Nos. 90 Civ. 2403 (MP), 90 Civ. 3315 (MP).

United States District Court, S.D. New York.

May 3, 1991.

Howard, Darby & Levin by Jack P. Levin, Lawrence A. Darby, Vivien B. Shelanski, New York City, for plaintiffs Banco Espanol de Credito, Banco Totta & Acores, Banesto Banking Corp., Girozentrale und Bank der Osterreichischen Sparkassen AG, Harmony Gold Ltd. Hong Kong, Intern. Commercial Bank of China, Monroe Bank & Trust, Phelps Dodge Corp., Saudi American Bank, State Street Bank & Trust Co. as Master Trustee for the Retirement Plans of Atlantic Richfield Co. and certain of its Subsidiaries, and Hachijuni Bank, Ltd.

Fried, Frank, Harris, Shriver & Jacobson by Jed S. Rakoff, Eric Queen, Marianna Koval, and Mudge, Rose, Guthrie, Alexander & Ferdon by Harold G. Levison, Michael C. Harwood, New York City, for defendants Sec. Pacific Nat. Bank and Sec. Pacific Merchant Bank.

## DECISION AND OPINION

MILTON POLLACK, Senior District Judge.

The parties have cross-moved pursuant to Rule 56 Fed.R.Civ.P., for summary judgment herein in favor of the plaintiffs and defendants respectively. Defendant has also moved for judgment on the pleadings in pursuance of Rule 12(c).

The parties have filed a Joint Statement of Undisputed Material Facts. Those facts and the depositions which are part of the record for the motions, sufficiently provide the basis for a Rule 56 determination of the issues. Although the parties also submitted disputed versions of other matter, those submissions were not essential to a determination of the issues presented.

For the reasons indicated hereafter, summary judgment dismissing the complaints will be granted to the defendants.

### I.

Each case must be decided on its own facts. This principle is especially applicable here. The expansive submissions covering banking practices in the industry and among other banks provide interesting and controversial reading, but these cases are to be decided on the facts pertaining to the transactions between these parties.

The plaintiffs contend that they purchased from the defendant, a commercial bank, a "security" subject to the rescission benefits of Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77$l$(2), as amended, and federal jurisdiction herein is posited on this contention. The plaintiffs are eight commercial banking institutions, two corporations, and one substantial Pension Trust.

Count I of the complaint seeks a recovery under the federal law; Count II asserts a claim of breach of contract between the parties; Count III asserts a breach of an alleged implied covenant of good faith and fair dealing; Count IV charges tortious misrepresentations by the defendant; and Count V claims breach of an alleged duty to disclose based on superior knowledge.

The plaintiffs purchased from Security Pacific, the defendant bank, 100% or, in some cases, lesser participations in short-term bank loans [1] made by Security Pacific

---

1. On the argument of this motion, plaintiff attempted to claim that the Advances to Integrat-

to one of its regular banking customers, Integrated Resources Inc. ("Integrated"), to whom it had been making loans for a number of years. Integrated was a financial service organization. The loans in question were made to facilitate the latter's current business operations in 1989. Integrated defaulted on its most recent loans, before maturity thereof and ultimately went bankrupt. Plaintiffs now sue Security Pacific (Count I) for the recovery of the unpaid loans, contending that the participations purchased were securities and that they were sold by Security Pacific to the plaintiffs with knowledge of negative financial information concerning Integrated that should have been called to the attention of plaintiffs. Fraud is not charged. The remaining Counts assert state law claims.

Security Pacific denies the applicability herein of federal securities law and denies that the banking transactions involved a security within the statutory definition thereof and if they did, that the Act does not apply to any security issued or guaranteed by any bank. 15 U.S.C. § 77c(a)(2). The participation contract, a Master Participation Agreement ("MPA"), entered into by each plaintiff, places on each plaintiff alone the entire responsibility for due diligence in ascertainment and appraisal of Integrated's creditworthiness. Security Pacific contends that it owed plaintiffs none of the alleged legal duties set forth in the complaints.

There is no basis on which to question that the short-term multi-million dollar loans made by Security Pacific to Integrated were made to facilitate its current operations and that the sale of participations therein were covered by the MPA.

## II. *Specific Provisions of the MPA*

The MPA spelled out the contractual agreements between the parties and described the business arrangement as involving the sale of a "loan." As set out therein, Security Pacific acted as manager of the loan. It made the advance to the borrower (Integrated) and where a purchase of the loan in whole or in part was agreed on, it debited a specific account of the plaintiff at Security Pacific in the amount of the purchased participation. It collected the loan when due from Integrated and allocated the agreed proceeds to the respective purchaser-participant.

The MPA provided, *inter alia:*

1. ...For purposes of this Agreement, an "Asset" shall be:

(a) *a loan* evidenced by a promissory note payable to the order of Security (or otherwise evidenced and payable to Security) denominated in U.S. dollars or foreign currency, or

(b) a Participation in a promissory note (or other evidence of obligation) payable in U.S. dollars or foreign currency to a lender (a "Lender") and purchased by Security under a participation agreement....

The relationship between Security and the Participant is and shall be that of a seller and purchaser of a property interest and not that of a debtor and creditor.

. . . .

4. Security shall exercise the same care in the administration and enforcement of any Asset as if it had retained the entire Asset for its own account, but it shall not be liable for any error in judgment or for any action taken or omitted to be taken by it, except for gross negligence or willful misconduct. Without limitation of the generality of the foregoing, Security ... (b) makes no warranty or representation ... and shall not be responsible for any statement, warranty or representation made in connection with any Asset or any document relative thereto or for the financial condition of any Borrower, Lender or Guarantor or for the value of any Collateral, (c) shall not be responsible for the performance or observance of any of the terms, covenants or conditions of any Asset or any document relative thereto and shall not have any duty to inspect the property (including the

---

ed were not "loans." However, the joint statement of undisputed facts labelled the Advances as "short-term advances/loans," and referred to

the "loan notes/loan participations" and "short-term loan participations," in 29 different paragraphs of the joint statement, e.g., ¶ 1, 2, 3, *et al.*

books and records) of any Borrower, Lender or Guarantor, (d) makes no warranty or representation as to and shall not be responsible for the due execution, legality, validity, enforceability, genuineness, sufficiency or collectibility of ... any Asset or any document relative thereto or any Collateral held as security for any Asset....

....

5. The Participant acknowledges that it has, independently and without reliance upon Security and based upon such documents and information as the Participant has deemed appropriate, made its own credit analysis and decision to purchase each Participation hereunder....

....

11. The Participant's participation in each Asset shall be on a silent basis and shall not be subdivided or transferred without the prior written consent of Security.

There is no question that the plaintiffs each agreed to make their own credit analysis of Integrated and do whatever was needed to keep themselves informed of Integrated's financial condition without any reliance on or assistance from Security Pacific. The MPA provided that Security Pacific was under no duty to inspect Integrated's books and records, nor to make a financial analysis of Integrated. Indeed, should Security Pacific do a financial analysis of its banking customers, it was under no duty to disclose the results to plaintiffs. The MPA exonerated any negligence of the defendant for failing to act on any financial analysis information coming to its attention that might be deemed to affect Integrated's creditworthiness.

Thus, the originating bank adopted no responsibilities for the integrity or payment of the loans—no obligation to the borrower (Integrated)—no obligation to the purchaser therefor. The purchase was fully without recourse excepting only to turn over to the purchaser collections obtained thereon.

### III. *Background*

Integrated Resources Inc. was a regular banking customer of defendant Security Pacific. From time to time the defendant made loans to Integrated on an overnight or short-term maturity basis (less than six months) to finance the latter's short-term cash needs, each loan having a particular maturity date and bearing interest at a particular rate. Security Pacific's advances were evidenced by a promissory note. From time to time, as Security Pacific made advances to Integrated, it offered participation therein to various of the plaintiffs to the maturity of the underlying loan, with interest and principal payable at maturity. The short-term loan involved offered yields superior to comparable money market instruments for placement of the participant's excess cash at interest, such as in Federal Funds, Commercial Paper, Certificates of Deposit or Eurodollar Deposits. The selection of the loan in which to participate was made by the respective plaintiff based on that plaintiff's own liquidity requirements. The participation was without recourse to Security Pacific. The minimum amount of the participation offered by Security Pacific was generally a million dollars, and the 17 participations by the 11 plaintiffs at issue herein, varied in amounts from one million dollars to ten million dollars with one participation at $600,000.

Security Pacific was the manager of each loan to Integrated and the allotted participation therein. Security Pacific was compensated for its management services by the difference between the interest rate it received from Integrated and the lower rate payable to the loan participant thereon.

Creditworthiness of Integrated was the initial basis of the relationship between it and Security Pacific. This was implemented with a line of credit under which each loan was made. Omnibus arrangements were made with Integrated for revolving loans and their repayment and there were known objects for the ongoing financing.

Typically, Integrated or any similar banking customer, entered into the a short-term loan program as a borrower after a credit check performed by Security Pacific's credit group. A credit limit for the borrower was set and the borrower would

sign and deliver to Security Pacific the so-called Multiple Advance Note.[2] Upon agreement to a requested loan, Security Pacific made the loan and confirmed it. Borrowers were normally reviewed once a year by the credit department of Security Pacific and could be removed by this group from the program for unacceptable credit risks.

Prospective purchasers of the participations from Security Pacific were not subject to an approval process. However, Security Pacific's salespersons would identify whether an entity had sufficient capital to participate. Individuals were excluded.

Security Pacific provided the plaintiffs with an advance list of the bank's customer/borrowers, including Integrated, and with the Standard & Poors rating of the customer/borrower's commercial paper. Integrated was rated A2 at the times here involved. This pre-screening list gave each prospective loan purchaser the opportunity to do its own due diligence check on the creditworthiness of Security Pacific's customer and then, on the prospective purchaser's own appraisal, to select borrowers and their loans that the former would be interested in.

Upon verbal agreement on the loan selected, the terms of a sale, and the extent of participation desired, a confirmation was sent to the respective participant reciting among other things that it was subject to the MPA. Public information pertaining to Integrated was available from Security Pacific, upon request. Non-public information was not usually shared between Security Pacific and those who purchased a participation.

Under express terms of the MPA, purchasers of the whole of a loan or of a participation in a loan made to Integrated had no right to trade it without the prior written permission of Security Pacific— which was not requested nor given.

All of the individual loans to Integrated in which some one of the plaintiffs participated and which were defaulted, were allot-

ted to a plaintiff in the period from April 10, 1989 and June 9, 1989; the respective loans matured variously up to November 8, 1989. Each plaintiff purchased and received a specific dollar interest in an identifiable loan—not an undivided interest in a loan portfolio.

## IV. *Applicable Legal and Regulatory Principles*

Section 2(1) of the 1933 Act provides: "[U]nless the context otherwise requires— (1) the term 'security' means any note ... evidence of indebtedness, ... investment contract, ... or any certificate of interest or participation in ... any of the foregoing." 15 U.S.C. § 77b(1).

Section 3(a)(2) and (3) of the 1933 Act provides: "Except as hereinafter expressly provided, the provisions of this title *shall not apply to* any of the following classes of securities: ... (2) ... *any security issued or guaranteed by any bank* ... (3) [a]ny note ... which has a maturity at the time of issuance of not exceeding nine months". 15 U.S.C. § 77c(a)(2) & (3) (emphases supplied).

Section 12(2) of the 1933 Act provides: "Any person who— ... (2) offers or sells a security (*whether or not exempted by the provision of section 3, other than paragraph (2) of subsection (a) thereof*), ... shall be liable". 15 U.S.C. § 77*l* (2) (emphases supplied).

The language in the 1933 and 1934 Acts in the definitions of the term "security" is not exactly identical; however, the Supreme Court has stated that the definitions of "security" will be treated as identical "in our decisions dealing with the scope of the term." *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 686 n. 1, 105 S.Ct. 2297, 2301 n. 1, 85 L.Ed.2d 692 (1985); *Marine Bank v. Weaver,* 455 U.S. 551, 555 n. 3, 102 S.Ct. 1220, 1223 n. 3, 71 L.Ed.2d 409 (1982); *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621 (1975); *Tcherep-*

---

**2.** *Integrated signed such a note to cover all advances from Security Pacific. See,* Hundley, Exh. 8, and reference thereon to "grid note"; *see*

*also,* Molloy Depos. at 117–18; Ahn Depos. at 143.

*nin v. Knight,* 389 U.S. 332, 335–36, 88 S.Ct. 548, 552–53, 19 L.Ed.2d 564 (1967).[3]

In defining a "security" the '33 Act makes clear through its introductory phrase that the definition thereof given in the statute is the guide "unless the context otherwise requires." 15 U.S.C. § 77b(1). Thus, literalism is negated, for "in searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin,* 389 U.S. at 336, 88 S.Ct. at 553, *quoted* in *United Housing Foundation,* 421 U.S. at 848, 95 S.Ct. at 2058. *See also, SEC v. W.J. Howey Co.,* 328 U.S. 293, 298, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244 (1946). Unusual instruments "not easily characterized as 'securities,'" such as those litigated here, will require looking to "the economic substance of the transaction, rather than just to its form, to determine whether the Act applied." *Landreth Timber,* 471 U.S. at 688, 690, 105 S.Ct. at 2302, 2204, *cited* in 2 L. Loss & J. Seligman, *Securities Regulation* 872–73 (3d ed. 1989).

It is settled law that certificates evidencing loans by commercial banks to its customers for their current operations are not securities. *Reves v. Ernst & Young,* 494 U.S. 56, 110 S.Ct. 945, 951, 108 L.Ed.2d 47 (1990) (approving holding and family resemblance test of *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 939 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984)); *American Bank & Trust Co. v. Wallace,* 702 F.2d 93, 97 (6th Cir.1983); *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1260 (9th Cir.1976); *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.,* 508 F.2d 1354, 1362 (7th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *Bellah v. First National Bank,* 495 F.2d 1109, 1114 (5th Cir.1974).

Although the underlying instrument is not a security, a participation in a non-security could itself be a security. *Commercial Discount Corp. v. Lincoln First Commercial Corp.,* 445 F.Supp. 1263, 1267 (S.D.N.Y.1978) ("It is quite logical, and is moreover well established, that a participation in a loan may be a security, even though the underlying loan is not." (citing cases)); *see also NBI Mortgage Investment Corp. v. Chemical Bank* [1976 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,632 at 90,146 (S.D.N.Y.1976).

The recent cases hold that participations in commercial loans are not "securities." 2 L. Loss & J. Seligman, *supra,* at 891 n. 66 ("In reaching this conclusion most recent cases concluded that a loan participation is not an investment contract under the *Howey* test."). Every circuit court that has ever considered the question has concluded that loan participations are not securities. *McVay v. Western Plains Service Corp.,* 823 F.2d 1395, 1398–1400 (10th Cir.1987); *Union National Bank of Little Rock v. Farmers Bank,* 786 F.2d 881, 884–85 (8th Cir.1986); *Kansas State Bank in Holton v. Citizens Bank of Windsor,* 737 F.2d 1490, 1493–95 (8th Cir.1984); *Union Planters National Bank of Memphis v. Commercial Credit Business Loans, Inc.,* 651 F.2d 1174, 1180–85 (6th Cir.) *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); *American Fletcher Mortgage Co. v. U.S. Steel Credit Corp.,* 635 F.2d 1247, 1253–55 (7th Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981); *United American Bank of Nashville v. Gunter,* 620 F.2d 1108, 1115–19 (5th Cir.1980).

Although the Second Circuit has not had occasion to rule on the question of whether a loan participation is a security, District Judge Kevin T. Duffy (himself a former SEC regional administrator) held in *Vorrius v. Harvey,* 570 F.Supp. 537 (S.D.N.Y. 1983), that "loan participations" were not securities where, as in the instant case, there exists protection under the federal banking laws, the purchase of the loan participation is a result of one-to-one negotiation between the plaintiff and defendant, and the purchaser is personally in a posi-

---

**3.** The Senate Report on the Securities Exchange Act similarly observed the definition of security in that Act is "substantially the same" as the definition in the Securities Act. S.Rep. No. 792, 73d Cong., 2d Sess. 14 (1934). See also H.R. Rep. No. 1383, 73d Cong., 2d Sess. 17 (1934).

tion to watch and protect its investment. Id. at 540. *But see Commercial Discount Corp.*, 445 F.Supp. at 1267–68.

This court recently stated in an analogous context in *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F.Supp. 531, 553 (S.D. N.Y.1990) (Pollack, J.):

> A participation in a banker's acceptance gives the purchasers an interest in that banker's acceptance. It does not give the purchaser an undivided interest in a pool of banker's acceptances. It is only a partial interest in an exempt underlying security and shares all of the underlying banker's acceptance's attributes.... Because a participation in a banker's acceptance does not have an identity separate from the banker's acceptance, the participation is not a "security."

*Id.* Similarly, because the plaintiffs here did not receive an undivided interest in a pool of loans, but rather purchased participation in a specific, identifiable short-term Integrated loan, the loan participation did not have an identity separate from the underlying loan. Since the underlying loan is not a security, neither is the participation therein.

■ Even the plaintiffs do not contest that "traditional" loan participations are not securities. What they are arguing is that the participations at issue arising in a short-term loan program are wholly different from traditional loans by the bank. Specifically, to refute the conclusion that would follow from the application of the *Mishkin* analogy, the plaintiffs contend that there is no independent underlying instrument that warrants the application of the *Mishkin* analysis. They are almost asserting that the underlying loans to Integrated are sham. They stress the fact that (1) the sale of a 100% participation was the object intended by Security Pacific, (2) participants were not limited to banks, (3) the role of Security Pacific was to match participants and borrowers, and (4) loan participations bear strong resemblance to commercial paper which is a security.

The basic claim by plaintiffs appears to be that the Security Pacific's loan partic-

ipations are a new type of instrument, different from traditional loan participations, and therefore are "notes" or "investment contracts" under § 2(1) of the '33 Act. However, the participations at bar are not "notes" and not "investment contracts."

In *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990), the Supreme Court stated that in determining whether an instrument denominated a "note" is a "security," courts are to start out by presuming that a note is a security, but that presumption may be rebutted by a showing that the note bears a strong resemblance to one of the enumerated categories which the Supreme Court set forth in *Reves, id.*, 110 S.Ct. at 951, of non-securities, to be tested by four factors: 1) the motivations that would prompt a reasonable seller and buyer to enter into it; 2) the plan of distribution of the instrument; 3) the reasonable expectation of the investing public; 4) existence of some other factor such as another regulatory scheme thereby rendering securities regulation unnecessary. *Id.* at 951–52. "If an instrument is not sufficiently similar to an item on the [non-security] list, the decision whether another category should be added [to that list] is to be made by examining the same factors." *Id.* at 952.

Applying these tests to the short-term loan participations sold by Security Pacific leads to the conclusion that these instruments bear a strong family resemblance to "loans by commercial banks [to customers] for current operations," *id.* at 951, which are a member of the non-security family.

The first factor to be considered and weighed is the motivation of the parties in entering this transaction. The uncontradicted motivation of the seller, Security Pacific, was to increase lines of credit available to Integrated as part of a continuing credit relationship. The sale of an Integrated loan would permit Security Pacific to diversify its risk among participants. Security Pacific was recompensed by retaining the difference between the interest rate it had charged to Integrated and the lower rate payable to the participant on the sale of that loan. Self-evidently, Integrat-

ed's motivation was to have access to a source of short-term funds that was competitive with alternative short-term money market instruments to finance current operations or to cover a temporary cash shortage. The motivation of the participant in buying all or part of the loan was to use its excess cash by purchasing a short-term vehicle that would earn a fixed rate of interest that was higher than alternative money market instruments. Thus, the overall motivation of the parties was the promotion of commercial purposes and not investments in a business enterprise.

The second *Reves* factor is the plan of distribution of the instrument. The opportunity to purchase short-term participations was offered only to institutional and corporate entities with sufficient capital to engage in this program. Individuals were specifically excluded. The minimum purchase amount was generally $1 million. Potential participants were introduced to this program through oral presentations at industry seminars or individualized solicitation. Detailed explanations of the program were presented to the institutions in an individualized manner by Security Pacific sales personnel.

The actual loan participation certificates were issued pursuant to the terms of the MPA. The MPA was the contractual agreement between, and signed by, each participant and Security Pacific. Each consummated participation was memorialized in a written one-page confirmation that was telecopied to the participant. Loan participations were not freely negotiable, but were transferable only with the prior written consent of Security Pacific.[4]

The plan of distribution was thus a limited solicitation to sophisticated financial or commercial institutions and not to the general public.

The third criterion is the reasonable perception of the instrument by the investing public. Since the Supreme Court has not defined "investing public" in the context of this *Reves* factor, it is unclear whether a subset of the general public could satisfy the definition. As previously noted, the general public was excluded from purchasing these instruments and were not targeted with promotional information. There is no indication that the general public was even aware of the existence of this program.

If "investing public" includes only institutions that would be targeted by Security Pacific sales personnel for inclusion on this program, the instruments could reasonably be viewed only as loan participations. The potential participant must read, negotiate and sign an MPA for inclusion in the program. A form of the MPA was included with the informational brochure. A reasonable sophisticated financial or commercial institution was on notice through the contractual provisions that the instruments are participations in loans and not investments in business enterprises.

The fourth criterion is the existence of another regulatory scheme that makes application of the federal securities laws unnecessary. The Office of the Comptroller of the Currency has issued specific policy guidelines, Circular 181, addressing the purchase and sale of loan participation by national banks.[5] Since Security Pacific is a national bank, it is subject to this regulatory scheme.

A *Reves* analysis thus indicates that short-term loan participations sold by Security Pacific resemble loans issued by a

---

4. The absence of a secondary market for these instruments is not significant since secondary markets do not exist for certain known securities, such as commercial paper.

5. In 1984, the Comptroller of the Currency issued Banking Circular 181:

    A [loan] participation, as distinguished from a multibank loan transaction (syndicated loan), is an arrangement in which a bank makes a loan to a borrower and then sells *all or a*

*portion* of that loan to a purchasing bank. All documentation of the loan is drafted in the name of the selling bank. Generally, the purchasing bank's share of the participated loan is evidenced by a certificate which assigns an interest in the loan and any related collateral. (Emphasis supplied.)

Banking Circular 181 (Rev.) [1984–1985 Transfer Binder] Fed. Banking L.Rep. (CCH) ¶ 60,799 at 38,858 (Aug. 2, 1984) (footnotes omitted).

bank for commercial purposes and accordingly are non-securities.

■ A sole possible remaining question is whether the participations in this case could be classed as "investment contracts." In *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court held that the test of whether an instrument is an "investment contract" under the securities law is whether it is an investment in a common venture with a reasonable expectation of profits to be derived from the entrepreneurial efforts of others. *Id.* 66 S.Ct. at 293–300.

As noted above, all federal circuit courts that have applied the *Howey* standard to the question whether a loan participation is an investment contract under federal securities laws have uniformly held that it is not. Considering and weighing the *Howey* criteria in the instant case reveals the following:

First, with respect to the element of "investment," considering the absence of a public offering and the very short-term nature of the loans and the participations therein, it is fair to associate the participations with the ordinary commercial risks taken by everyday lenders and not the longer-term, more fundamental risk characteristic of the true investment.

Second, as to the element of "reasonable expectation of profits," the Supreme Court has defined "profits" under the *Howey* test as meaning "either capital appreciation resulting from the development of the initial investment ... or a participation in earnings resulting from the use of investors' funds." *United Housing Foundation*, 421 U.S. at 852, 95 S.Ct. at 2060. *Accord Reves*, 110 S.Ct. at 952 n. 4. In the present case, the plaintiffs had no expectation of capital appreciation from the monies placed in the loans; the rate of return consisted solely of the repayment of the principal plus a fixed rate of interest. MPA ¶ 2. The "receipt of interest is not directly tied to profitability in such a way as to make loan participations securities." *McVay*, 823 F.2d at 1399 (citation omitted).

Third, as to the requirement of "entrepreneurial efforts of others," since the

principal and interest owed to the plaintiffs were fixed, the return did not fluctuate depending upon the efforts of Integrated or Security Pacific.

The participations here fail the *Howey* tests.

## V. *No Duty Was Breached*

■ Each plaintiff-purchaser accepted, without comment, a confirmation certificate that expressly states the sales were made pursuant to the MPA:

> We [Security Pacific] confirm our offer to sell to you under the Master Participation Agreement dated as of ____ between you and Security Pacific National Bank the following asset[.]

The plaintiffs seek to invoke a covenant of good faith and fair dealing in the relationship. However, courts do not impose an obligation which would be inconsistent with other terms of the contractual relationship and for which the parties did not bargain.

> [T]he implied covenant of good faith and fair dealing does not provide a court *carte blanche* to rewrite the parties' agreement. Thus, a court cannot imply a covenant inconsistent with terms expressly set forth in the contract.... Nor can a court imply a covenant to supply additional terms for which the parties did not bargain.

*Hartford Fire Insurance Co. v. Federated Department Stores, Inc.*, 723 F.Supp. 976, 991 (S.D.N.Y.1989) (citations omitted).

The implied covenant of good faith does not "operate to create new contractual rights." *See Don King Productions, Inc. v. Douglas*, 742 F.Supp. 741, 767 (S.D.N.Y. 1990).

The signed MPA directly contradicts any claim that Security Pacific was on notice that plaintiffs were relying on volunteering matters coming to its attention that arguably might seem negative in respect to Integrated's creditworthiness.

■ In the case of arm's-length transactions between large financial institutions, no independently imposed duty of volunteering disclosure exists. In *First Citi-*

*zens Federal Savings & Loan Ass'n v. Worthen Bank & Trust Co.*, 919 F.2d 510 (9th Cir.1990), a participant sued the lead bank on the notion of an alleged breach of fiduciary duty, *inter alia*, after the borrower defaulted and participants incurred losses. In holding that there was no fiduciary duty or breach thereof, the Ninth Circuit stated that:

> Unlike the automatic, status-based fiduciary duty which exists, for example, between attorney and client, fiduciary duties among loan participants depend upon the terms of their contract....
>
> ....
>
> In the context of loan participation agreements among sophisticated lending institutions, we are of the opinion that fiduciary relationships should not be inferred absent unequivocal contractual language.... Banks and savings institutions engaged in commercial transactions normally deal with one another at arm's length and not as fiduciaries. *See Aaron Ferer & Sons v. Chase Manhattan Bank*, 731 F.2d 112, 122 (2d Cir. 1984). This rule holds true for institutions engaged in loan participation agreements.

*Id.* at 513–14 (citations omitted).

In the above cited case, *Aaron Ferer & Sons v. Chase Manhattan Bank*, 731 F.2d 112, 122 (2d Cir.1984) (Pratt, J.), the Second Circuit stated that "[a] correspondent bank relationship, standing alone, does not create a [fiduciary] relationship." It also stated that:

> During the course of negotiations surrounding a business transaction, a duty to disclose may arise in two situations: first, where the parties enjoy a fiduciary relationship; and second, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

*Id.* at 123 (citations omitted).

In the case of arm's length transactions between large financial institutions, no fiduciary relationship exists unless one was created in the agreement. No confidential information is claimed to be involved herein and access to the supposed negative information was public and available by due diligence on the part of plaintiffs. Causation between the non-disclosure and injury would still be required and that is thoroughly negated by the agreement of the parties that the participants would not rely on Security Pacific but would conduct their own research.

▬▬ When a contract is unambiguous, as is the MPA, the meaning of the contract is properly determined on a motion for summary judgment. Courts do not look beyond the expressed provisions of a contract to determine the contract's meaning. Rather, courts must enforce the legal relations in accordance with the meaning ascribed by the contract.

"[W]here the parties to an agreement have expressly allocated risks, the judiciary shall not intrude into their contractual relationship." *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729, 735 (2d Cir.1984). Judge Kaufman, writing for the Court, found contract language "unambiguous", and stated that, "[b]y giving effect to explicit contractual terms, a court has a better chance to carry out the intentions of the parties. Particularly where the two sides are sophisticated, their allocation of risk and potential benefit is properly treated as supreme to any conflicting understanding we may have." *Id.* at 734.

The express disclaimer provisions of the MPA preclude the common law claims asserted by the various plaintiffs.

### CONCLUSION

Loan participations generated by a commercial bank initially for the benefit of the bank's regular customer, if litigable on the notion that participations therein are "securities" not commercial loans, portend grave practical consequences. A holding to that effect would then pose duties and penalties under the federal laws.

Registration requirements under federal laws would all but put an end to the flexibility of every day commercial loans conceived and intended for working capital

purposes of a business if they were saddled with SEC requirements by labelling a loan participation therein as a security.

The Supreme Court has ruled that application of the securities law must be read with the economic realities underlying the transaction. *United Housing Foundation v. Forman,* 421 U.S. 837, 848, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975); *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244 (1946).

Construction of the '33 Act and relief of the sort claimed here—if it were desirable—must be initiated by and derive from Congress or regulatory authorities. An industry-wide traditional understanding which negates the application of federal securities laws to commercial participations in short-term bank loans should not be overridden by this Court's technical acceptance of a literal definition of a statute whose purposes were not so intended and were enacted in a different context. The banking industry at large seemingly has universally acted upon the assumption that federal securities law is not applicable to such transactions and this case gives no indication that it should be otherwise.

The plaintiff-participants had the choice of finding their own customers and making direct loans on their own due diligence. They chose rather to assume the risks and to act on their own responsibility by purchasing without recourse to Security Pacific. The holder of the participation became the lender in fact with Security Pacific as its collection agent. That was their contractual bargain and expectancy. No claim is made of any fraud by Security Pacific. The participating purchasers did not purchase a security and there is no evidence that they intended to do so. The transactions at bar were primarily mercantile or consumer, rather than investment transactions, and did not involve a public distribution. *Cf.* American Law Institute proposed Fed. Secs. Code § 202(150)(B)(iii) (1978).

These were private commercial loan contracts. There is no claim of misrepresentation of material facts—there were no duties such as claimed that were created or extant between the parties nor was there a breach of any duty owing to plaintiffs or of the MPA.

Summary judgment is granted to defendants. There are no genuine issues of material fact in dispute and defendants are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

Complaints dismissed, with costs.

SO ORDERED.