973 F.2d 51
 61 USLW 2027, Fed. Sec. L. Rep. P 96,819
 BANCO ESPANOL de CREDITO; Banesto Banking Corporation;
Banco Totta & Acores; Girozentrale Und Bank Der
Osterreichischen Sparkassen AG; Harmony Gold Ltd. Hong
Kong; International Commercial Bank of China; Monroe Bank
& Trust; Phelps Dodge Corporation; Saudi American Bank;
State Street Bank & Trust Company, as Master Trustee for the
Retirement Plans of Atlantic Richfield Company and certain
of its subsidiaries, Plaintiffs-Appellants,
v.
SECURITY PACIFIC NATIONAL BANK; Security Pacific Merchant
Bank, Defendants-Appellees,
HACHIJUNI BANK, LTD., Plaintiff-Appellant,
v.
SECURITY PACIFIC NATIONAL BANK; Security Pacific Merchant
Bank, Defendants-Appellees.
 Nos. 358, 359, Dockets 91-7563, 91-7571.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 28, 1991.
Decided June 24, 1992.
As Amended Sept. 8, 1992.
 
 Charles E. Dorkey III, New York City (Thomas I. Sheridan III, Mark Garbowski, Richards & O'Neil, of counsel), for plaintiffs-appellants Banco Espanol de Credito and Banesto Banking Corp.
 Jack P. Levin, New York City (Lawrence A. Darby III, Vivien B. Shelanski, J. Jay Lobell, Howard Darby & Levin, of counsel), for plaintiffs-appellants Banco Totta & Acores, et al.
 Jed S. Rakoff, New York City (Fried, Frank, Harris, Shriver & Jacobson; Harold G. Levison, Mudge, Rose, Guthrie, Alexander & Ferdon, of counsel), for defendants-appellees Security Pacific Nat. Bank and Security Pacific Merchant Bank.
 John L. Warden, New York City (H. Rodgin Cohen, Michael M. Wiseman, David A. Heiner, Jr., Sullivan & Cromwell, New York City, of counsel) filed a brief amicus curiae on behalf of The New York Clearing House Ass'n.
 James R. Doty, Washington, D.C. (Jacob H. Stillman, Eric Summergrad, Martha H. McNeely, Randall W. Quinn, Paul Gonson, Washington, D.C., of counsel) filed a brief amicus curiae on behalf of the S.E.C.
 Before OAKES, Chief Judge, FEINBERG and ALTIMARI, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 Plaintiffs-appellants, purchasers of various "loan participations" sold by defendants-appellees Security Pacific National Bank and Security Pacific Merchant Bank (collectively "Security Pacific"), appeal from a judgment entered in the United States District Court for the Southern District of New York (Milton Pollack, Judge ), granting summary judgment for Security Pacific and dismissing plaintiffs' complaints. In the two underlying actions, which were consolidated for appeal, plaintiffs charged that Security Pacific had withheld material information on the financial solvency of Integrated Resources, Inc. ("Integrated") when Security Pacific sold plaintiffs portions of loan notes owed by Integrated to Security Pacific. Plaintiffs sought to rescind their purchase agreements based on an alleged violation of Section 12(2) of the 1933 Securities Act and sought damages for Security Pacific's alleged breach of various common law duties.
 
 
 2
 Plaintiffs moved for summary judgment on the securities claim and Security Pacific cross-moved for summary judgment on all claims. In granting defendants' motion for summary judgment, the district court first rejected plaintiffs' securities claim, holding that the loan participations at issue were not "securities" within the meaning of the 1933 Act, and were therefore not governed by the federal securities laws. The district court also rejected plaintiffs' common law claims, finding that Security Pacific had no duty to disclose information on Integrated's financial condition under either the terms of the loan participation agreements signed by plaintiffs or under general principles of common law.
 
 
 3
 On appeal, plaintiffs contend that the district court erred in: (1) determining that loan participations sold by Security Pacific were not securities; and (2) determining that Security Pacific owed no duty to disclose negative financial information about Integrated.
 
 
 4
 For the reasons set forth below, we affirm the judgment of the district court.
 
 BACKGROUND
 
 5
 In 1988, Security Pacific extended a line of credit to Integrated permitting Integrated to obtain short-term unsecured loans from Security Pacific. Security Pacific subsequently made a series of short-term loans to Integrated. Security Pacific sold these loans, in whole or in part, to various institutional investors at differing interest rates. Resales of these loans were prohibited without Security Pacific's express written consent. The practice of selling loans to other institutions is known as "loan participation." Short-term loan participation permits a primary lender such as Security Pacific to spread its risk, while at the same time allowing a purchaser with excess cash to earn a higher return than that available on comparable money market instruments. Security Pacific, as manager of the loans, earned a fee equal to the difference between the interest paid by the debtor and the lower interest paid to the purchaser.
 
 
 6
 Security Pacific assumed no responsibility for the ability of Integrated to repay its loans. Indeed, each purchaser of loan participations was required to enter into a Master Participation Agreement ("MPA"), which contained a general disclaimer providing, in relevant part, that the purchaser "acknowledges that it has independently and without reliance upon Security [Pacific] and based upon such documents and information as the participant has deemed appropriate, made its own credit analysis."
 
 
 7
 In late 1988, Integrated began to encounter financial difficulties. In April 1989, Security Pacific refused a request by Integrated to extend further credit. Despite this refusal, Security Pacific continued to sell loan participations on Integrated's debt. Indeed, from mid-April through June 9, 1989, Security Pacific sold seventeen different loan participations to plaintiffs-appellants. Unable to obtain enough working capital, Integrated began defaulting on its loans on June 12, 1989. Integrated subsequently declared bankruptcy.
 
 
 8
 As a result of Integrated's default, two sets of investors, who had purchased the seventeen loan participations, initiated separate actions against Security Pacific in the United States District Court for the Southern District of New York. Contending that the loan participations were "securities" within the meaning of the Securities Act of 1933 ("the 1933 Act"), plaintiffs sought to rescind their purchase agreements by alleging that Security Pacific had failed to disclose to them material facts about Integrated's financial condition in violation of § 12(2) of the 1933 Act. 15 U.S.C. § 77l (2). Plaintiffs also claimed that Security Pacific's failure to disclose constituted a breach of Security Pacific's implied and express contractual duties under its MPA's, and a breach of Security Pacific's duty to disclose material information based on superior knowledge. Based on these common law claims, plaintiffs sought to recover their investment plus unpaid interest. Plaintiffs in each of the two actions moved for partial summary judgment on the securities claim. Security Pacific cross-moved for summary judgment on all claims. The cases were consolidated for argument.
 
 
 9
 In ruling on these motions, the district court concluded that the loan participations were not "securities" within the meaning of the Securities Act of 1933, and that, therefore, plaintiffs could not assert a violation under § 12(2) of this Act. In addition, the district court held that the express disclaimer provisions in the MPA precluded plaintiffs' common law claims. Accordingly, the district court granted summary judgment to Security Pacific and dismissed the complaints. See Banco Espanol de Credito v. Security Pacific National Bank, 763 F.Supp. 36 (S.D.N.Y.1991). Plaintiffs now appeal.
 
 DISCUSSION
 
 10
 Summary judgment is properly granted when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); Viacom Int'l, Inc. v. Icahn, 946 F.2d 998, 1000 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1244, 117 L.Ed.2d 477 (1992). We review the district court's grant of summary judgment de novo and resolve all ambiguities and inferences from the underlying facts in favor of the party against whom summary judgment is sought. See, e.g., Viacom Int'l, Inc., 946 F.2d at 1000.
 
 
 11
 Section 2(1) of the 1933 Act provides in pertinent part:
 
 
 12
 [U]nless the context otherwise requires--(1) the term "security" means any note ... evidence of indebtedness, ... investment contract, ... or any certificate of interest or participation in ... any of the foregoing.
 
 
 13
 15 U.S.C. § 77b(1). It is well-settled that certificates evidencing loans by commercial banks to their customers for use in the customers' current operations are not securities. See, e.g., Reves v. Ernst & Young, 494 U.S. 56, 65, 110 S.Ct. 945, 951, 108 L.Ed.2d 47 (1990) (citing Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 939 (2d Cir.), cert. denied, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984)). However, as the district court noted, a participation in an instrument might in some circumstances be considered a security even where the instrument itself is not. See Banco Espanol de Credito, 763 F.Supp. at 41.
 
 
 14
 With respect to loan participations, the district court reasoned that "because the plaintiffs ... did not receive an undivided interest in a pool of loans, but rather purchased participation in a specific, identifiable short-term Integrated loan, the loan participation did not have an identity separate from the underlying loan." Id. at 42. Thus, Judge Pollack reasoned, because under Chemical Bank the loans to Integrated were not securities, the plaintiffs' purchase of discrete portions of these loans could not be considered securities.
 
 
 15
 On appeal, plaintiffs concede that traditional loan participations do not qualify as securities. Instead, plaintiffs contend that the peculiar nature of Security Pacific's loan participation program--which aimed at the sale of 100% of its loans through high speed telephonic sales and often pre-paid transactions--qualified these loan participations as securities. Specifically, plaintiffs argue that the loan participations sold by Security Pacific are more properly characterized as securities--in the nature of "notes"--as enumerated in § 2(1) of the 1933 Act.
 
 
 16
 In examining whether the loan participations could be considered "notes" which are also securities, the district court applied the "family resemblance" test set forth by the Supreme Court in Reves, 494 U.S. at 63-67, 110 S.Ct. at 950-952. Under the family resemblance test, a note is presumed to be a security unless an examination of the note, based on four factors, reveals a strong resemblance between the note and one of a judicially-enumerated list of instruments that are not securities. Id. at 65, 110 S.Ct. at 951. If the note in question is not sufficiently similar to one of these instruments, a court must then consider, using the same four factors, whether another category of non-security instruments should be added to the list. Id. at 67, 110 S.Ct. at 951. The four Reves factors to be considered in this examination are: (1) the motivations that would prompt a reasonable buyer and seller to enter into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor, such as the existence of another regulatory scheme, significantly reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary. Id. at 66-67, 110 S.Ct. at 951-952.
 
 
 17
 In addressing the first Reves factor, the district court found that Security Pacific was motivated by a desire to increase lines of credit to Integrated while diversifying Security Pacific's risk, that Integrated was motivated by a need for short-term credit at competitive rates to finance its current operations, and that the purchasers of the loan participations sought a short-term return on excess cash. Based on these findings, the district court concluded that "the overall motivation of the parties was the promotion of commercial purposes" rather than an investment in a business enterprise. Banco Espanol de Credito, 763 F.Supp. at 42-43.
 
 
 18
 Weighing the second Reves factor--the plan of distribution of the instrument--the district court observed that only institutional and corporate entities were solicited and that detailed individualized presentations were made by Security Pacific's sales personnel. The district court therefore concluded that the plan of distribution was "a limited solicitation to sophisticated financial or commercial institutions and not to the general public." Id. at 43. We agree.
 
 
 19
 The plan of distribution specifically prohibited resales of the loan participations without the express written permission of Security Pacific. This limitation worked to prevent the loan participations from being sold to the general public, thus limiting eligible buyers to those with the capacity to acquire information about the debtor. This limitation also distinguishes Gary Plastic Packaging v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230 (2d Cir.1985), which involved a secondary market for the instruments traded in that case.
 
 
 20
 With regard to the third factor--the reasonable perception of the instrument by the investing public--the district court considered the expectations of the sophisticated purchasers who signed MPA's and determined that these institutions were given ample notice that the instruments were participations in loans and not investments in a business enterprise. Id.
 
 
 21
 Finally, the district court noted that the Office of the Comptroller of the Currency has issued specific policy guidelines addressing the sale of loan participations. Thus, the fourth factor--the existence of another regulatory scheme--indicated that application of the securities laws was unnecessary. Id.
 
 
 22
 Thus, under the Reves family resemblance analysis, as properly applied by the district court, we hold that the loan participations in the instant case are analogous to the enumerated category of loans issued by banks for commercial purposes and therefore do not satisfy the statutory definition of "notes" which are "securities." Since the loan participations do not meet the statutory definition of securities, plaintiffs may not maintain their action for relief under § 12(2) of the 1933 Act.
 
 
 23
 We rule only with respect to the loan participations as marketed in this case. We recognize that even if an underlying instrument is not a security, the manner in which participations in that instrument are used, pooled, or marketed might establish that such participations are securities. See Gary Plastic Packaging, 756 F.2d at 240-42.
 
 
 24
 Turning to plaintiffs' contractual and other common-law claims, we agree with the district court that the waiver provision in the MPA's signed by the loan participants specifically absolved Security Pacific of any responsibility to disclose information relating to Integrated's financial condition. Moreover, as an arms length transaction between sophisticated financial institutions, the law imposed no independent duty on Security Pacific to disclose information that plaintiffs could have discovered through their own efforts. See, e.g., Aaron Ferer & Sons v. Chase Manhattan Bank, 731 F.2d 112, 122 (2d Cir.1984).
 
 CONCLUSION
 
 25
 Based on the foregoing, and on Judge Pollack's well-reasoned opinion, we affirm the judgment of the district court.
 
 OAKES, Chief Judge, dissenting:
 
 26
 I believe that the majority opinion mistakenly assumes that the debt instruments--which Security Pacific terms "loan notes"--were sold in a "loan participation" and hence were not "securities." In doing so, I fear that the majority opinion misreads the facts, makes bad banking law and bad securities law, and stands on its head the law of this circuit and of the Supreme Court in Reves v. Ernst & Young, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). Accordingly, I dissent.
 
 
 27
 For reasons that I will explain in detail, I agree with the Securities and Exchange Commission, which submitted a brief amicus curiae, a brief which is not mentioned in the majority opinion, that these so-called loan notes were purchased in investment transactions and are securities accordingly, and that the loan note program engaged in by Security Pacific, while bearing a superficial resemblance to traditional loan participations, differs from those traditional participations in several important respects, including (1) who the participants are; (2) what the purposes of the purchasers or participants are; and (3) what the promotional basis used in marketing the loan notes is. The participants, rather than being commercial lenders who engage in traditional loan participations, were instead in many cases non-financial entities not acting as commercial lenders but making an investment, and even though there were some banks that purchased the so-called loan notes, they generally did so not through their lending departments but through their investment and trading departments. These participants were motivated not by the commercial purpose of operating a lending business in which participations are taken as an adjunct to direct lending operations, but were motivated by an investment purpose. The promotional literature put out by Security Pacific advertised the so-called loan notes as competitive with commercial paper, a well-recognized security under the Securities Act, and on the basis of the return that they offered over that of other investments.
 
 
 28
 Beyond that, and importantly to the Securities Act aspect of the case, these loan notes differ from traditional loan participations in the scope of information available to the purchasers. In the traditional loan participation, participants generally engage in one-to-one negotiation with the lead lender, and at times with the borrower, and can inspect all information, public and non-public, that is relevant, and consequently are able to do their own credit analysis. Here, Security Pacific did not provide the participants with non-public information it had, provided only publicly-available documents or ratings, and the purchasers were not in a position to approach the hundred or more possible borrowers in the program and conduct their own examinations. This is important for, as emphasized in Reves, 494 U.S. at 60, 110 S.Ct. at 949, "[t]he fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 849 [95 S.Ct. 2051, 2059, 44 L.Ed.2d 621] (1975)." It is for this reason--overlooked by the majority--that "because the Securities Acts define 'security' to include 'any note,' we begin with a presumption that every note is a security." Reves, 494 U.S. at 65, 110 S.Ct. at 951.
 
 
 29
 I have said above that I believe the majority has misread the facts. Security Pacific is a California-based national banking association, a so-called money center bank, which through its division Security Pacific Merchant Bank ("Merchant Bank") has since 1985 conducted what it calls a "commercial loan note program." In that program, Security Pacific sells to a variety of financial and non-financial institutions and other entities its so-called loan notes. While these purchasers included foreign and domestic banks, 53 percent of them were not financial institutions; 23 percent were corporations; 18 percent were institutional investors; 4 percent were insurance companies; 2 percent were mutual funds; 2 percent were trust departments; and 4 percent were money managers, all of the above typically purchasing loan notes in a minimum amount of one million dollars. These notes are unsecured, have short-term maturities ranging from overnight to one year, with a concentration in the overnight to 30-day range. The program was conducted by Merchant Bank's corporate debt department, situated in a room where several trading operations were conducted, including those involving government instruments, foreign currency, and Euro-dollar futures. That department was not part of the commercial loan operation of Security Pacific. The program was created to allow Security Pacific to compete with investment bankers who could place short-term commercial paper for corporations at a lower cost than traditional commercial bank loans, that commercial paper unquestionably being securities. Indeed, Security Pacific's promotional literature advertised loan notes as follows: "Commercial Loan Notes yield 15 to 50 basis points more than their commercial paper equivalents." The borrowers, to whom Security Pacific referred as "issuers," were first analyzed by the bank's credit officers, and once approved obtained an internal, uncommitted, unsecured credit line separate from the bank's traditional commercial loan limits. This line established how much in advances to that issuer Security Pacific could hold at any one time, but did not impose a limit on the amount of loan notes that the Merchant Bank corporate debt department could sell to others. In this case, for example, the issuer's credit line was 10 million dollars, but the participations sold to others at the time of default amounted to more than 80 million dollars.
 
 
 30
 Entities expressing an interest in participating as purchasers, sometimes contacted by the bank through "cold calls," usually signed a Master Participation Agreement ("MPA") before their first purchase, governing all subsequent purchases. The notes were sold with recourse against the borrower only and no recourse against Security Pacific, whose duty was simply to collect payments on the underlying note payable to it and pay collections to the participants. The MPA purported to relieve Security Pacific of liability for "any error in judgment or for any action taken or omitted to be taken by it, except for gross negligence or willful misconduct." The MPA also relieved Security Pacific of any obligation as to any representation concerning the financial condition of a borrower or duty to inspect the books and records of a borrower or responsibility for the collectibility of any loan. In addition, the MPA required participants to acknowledge that they had "independently and without reliance upon" Security Pacific, made their own credit analysis and decision to purchase a participation.
 
 
 31
 According to Security Pacific's promotional literature,
 
 
 32
 Security Pacific's strong trading capabilities afford investors a large selection of issuers, maturities, and amounts from which to choose. Our traders and sales professionals work closely with investors in order to match their individual investment needs. (Emphasis supplied.)
 
 
 33
 It also promoted the liquidity of the instrument, stating that Security Pacific would "make a bid on a Security Pacific-originated loan note on a best efforts basis and represented that although it did not 'fully commit to make a secondary market in loan notes,' its 'trading and distribution capabilities should afford [purchasers] liquidity in most cases.' " From 1986 through October 1990, a total of 843 entities purchased one or more loan notes in the program, and as of 1989 Security Pacific had approximately six to seven hundred investors and approximately one hundred to two hundred fifty active borrowers. Nor was this a program limited to Security Pacific. As pointed out in the SEC amicus brief, the 1980s, in addition to seeing the era of "junk bonds," saw a vast expansion of sales by large money center banks of participations in short-term loans made to corporate buyers, sort of an evolution out of old-style banking into investment banking, in an effort to compete with the borrowing of money through debt instruments, such as commercial paper, rather than through traditional bank loans. The SEC estimates that the total market for these loan notes is considerable, with annual sales by all sellers estimated in excess of 100 billion dollars a year. This case, therefore, is not exactly about chicken feed.
 
 
 34
 We start off by looking at the broad definition of "security" within the meaning of section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l (2) (1988).[1] Section 2(1), 15 U.S.C. § 77b(1) (1988), defines "security" to mean "any note, ... evidence of indebtedness, ... or any certificate of interest or participation in ... any of the foregoing."
 
 
 35
 The legal question we have before us is whether the notes issued by Integrated Resources, Inc. ("Integrated") were securities within the meaning of section 12(2) of the Securities Act of 1933.
 
 
 36
 We start with the proposition as set forth in Justice Marshall's opinion for the Court in Reves that Congress "recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.' " 494 U.S. at 60-61, 110 S.Ct. at 948-949 (quoting SEC v. W.J. Howey Co., 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946)) and with the proposition that "Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called." 494 U.S. at 61, 110 S.Ct. at 949. The Court there adopted the Second Circuit's "family resemblance" test as set forth in, e.g., Exchange Nat'l Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1138 (2d Cir.1976), 494 U.S. at 64-65, 110 S.Ct. at 950-951, with certain modifications, however. The first such modification is that the Second Circuit test provided that only notes with a term of more than nine months were presumed to be securities. Exchange Nat'l Bank of Chicago, 544 F.2d at 1137-38. The Supreme Court in Reves refused to express any view on whether the '34 Act statutory exception for notes with a maturity of nine months or less affected the presumption that every note is a security. 494 U.S. at 65 n. 3, 110 S.Ct. at 951 n. 3. The Court did agree, however, that types of notes that are not "securities" include
 
 
 37
 the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized),
 
 
 38
 494 U.S. at 65, 110 S.Ct. at 951 (quoting Exchange Nat'l Bank of Chicago, 544 F.2d at 1138), and "notes evidencing loans by commercial banks for current operations," id. (quoting Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 939 (2d Cir.), cert. denied, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984)). But the Court added that "[m]ore guidance ... is needed," especially since the Second Circuit list "is 'not graven in stone.' " Id., 494 U.S. at 65-66, 110 S.Ct. at 951-952 (quoting Chemical Bank, 726 F.2d at 939).
 
 
 39
 The additional guidance consisted in applying a four factor test. The first factor is the motivations that would prompt a reasonable seller and buyer to enter into the transaction. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is more likely to be a security, while if the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good or to correct for the seller's cash flow difficulties or advance some other commercial or consumer purpose, the note is less sensibly described as a "security." The second factor is the plan of distribution of the instrument. If it is an instrument in which there is "common trading for speculation or investment," SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed.2d 88 (1943), then it is more likely to be a security. The third factor is the reasonable expectations of the investing public. Finally, the Court examines whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument. Reves, 494 U.S. at 66-67, 110 S.Ct. at 951-952.
 
 
 40
 Judge Wright, in his concurring opinion in Great Western Bank & Trust v. Kotz, 532 F.2d 1252 (9th Cir.1976), put the difference between lending banks (and hence real loan participants) and the investors here involved very well:
 
 
 41
 While banks are subjected to risks of misinformation, their ability to verify representations and take supervisory and corrective actions places them in a significantly different posture than the investors sought to be protected through the securities acts.
 
 
 42
 In an investment situation, the issuer has superior access to and control of information material to the investment decision. Rather than relying solely on semi-anonymous and secondhand market information, as do most investors, the commercial bank deals "face-to-face" with the promisor.
 
 
 43
 Id. at 1261-62 (Wright, J., concurring). Judge Wright's "approach" in using this language was referred to by Judge Friendly in Exchange Nat'l Bank of Chicago, 544 F.2d at 1136, as "rather appealing," though his opinion for the court declined to accept Judge Wright's suggestion that no note given to evidence a bank loan can be a "security." Id. at 1137. In other words, Judge Friendly disapproved Judge Wright's approach as carrying too far the exemption from the securities acts for commercial bank loans negotiated face-to-face. In Chemical Bank, 726 F.2d at 938 & n. 14, Judge Friendly noted the intervening approval (by way of a cf. cite) by the Supreme Court of the Wright Great Western concurrence in Marine Bank v. Weaver, 455 U.S. 551, 560 n. 10, 102 S.Ct. 1220, 1225 n. 16, 71 L.Ed.2d 409 (1982). Here, the originating bank, Security Pacific, had no commitment to transfer full credit information and eschewed any duty to the investors, providing only publicly-available information and not an independent credit analysis. The fact that the purchasers here were sophisticated entities does not exclude them from being considered a "broad segment of the public," Reves, 494 U.S. at 68, 110 S.Ct. at 953. And that is all the Court has held to be necessary to establish the requisite "common trading" in an instrument. See, e.g., Landreth Timber Co. v. Landreth, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985) (stock of closely-held corporation); W.J. Howey Co., 328 U.S. at 295, 66 S.Ct. at 1101 (units of citrus grove and maintenance contract not traded on exchange).
 
 
 44
 Moreover, it is important to look at Security Pacific's overall loan note program and not just at the sale of Integrated notes. Potential purchasers were not presented with one loan and asked if they wanted to participate in it, but were solicited, often on a daily basis, and offered a range of investment options involving different issuers with different maturities and interest rates. The investors were looking for short-term means to place excess cash and were motivated by the maximum return available from the investments offered. The bottom line is that the market closely resembles the commercial paper market which Judge Lasker once described as involving "a series of brief telephone conversations" between buyer and seller, University Hill Foundation v. Goldman, Sachs & Co., 422 F.Supp. 879, 885 (S.D.N.Y.1976), and, as he pointed out, "because of the large amounts involved buyers understandably desire to complete the transaction on the date of the sale to avoid losing a day's interest," id., which is the very case here. Whatever the language of the MPAs relied upon by the majority and the district court, the language of the promotional literature repeatedly referred to "investors" and "investments."
 
 
 45
 Thus, I consider the four-part test of Reves applied to the facts here to make the so-called loan notes "securities" under section 12(2), and would reverse.*
 
 
 
 [1]
 Section 12(2) by its terms applies whether or not the security is exempt under section 3(a)(3) of the Securities Act of 1933, 15 U.S.C. § 77c(a)(3) (1988), which exempts notes and other paper, used for current operations, with maturity of not exceeding nine months
 
 
 *
 While I think that the changes in the amended panel majority opinion do a lot to narrow the scope and, hence, the impact of its decision, even with those changes I think the decision wrong, for reasons previously stated. I therefore continue to dissent